IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**ALFRED DARNELL LANE,**

      Petitioner,

v.                                          Civil Action No. **3:19CV948**

**HAROLD CLARKE,**

      Respondent.

**MEMORANDUM OPINION**

Alfred Darnell Lane, a Virginia state prisoner proceeding *pro se*, brings this petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1) challenging his 2016 convictions in the Circuit Court of the City of Portsmouth, Virginia ("Circuit Court"). In his § 2254 Petition, Lane argues that he is entitled to relief on the following grounds:[1]

> Claim One:   "Petitioner was denied due process of law of his right to confront [and] cross-examine witnesses and present a defense to the charges," when (a) the "trial judge abused discretion and committed plain error when he allowed inadmissible evidence (recorded testimony on a jail phone call between Petitioner and Melvina Banks)" (ECF No. 1-1, at 7);

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system for citations to the parties' submissions. The Court corrects the capitalization and punctuation and omits the emphasis in quotations from Lane's submissions.

In his § 2254 Petition, attachments, and Memorandum, Lane appears to have several separate statements of fact and statements of his claims for relief. In the § 2254 Petition form, Lane lists Ground One as having five subparts, and Ground Two as having three subparts. He then indicates to "see attached" for each claim. (ECF No. 1, at 5, 7.) Lane attaches a handwritten document called "PETITIONER FOR A WRIT OF HABEAS CORPUS" to the standardized form which includes a narrative statement of the case, facts, and what appears to be argument directed at no claim in particular. However, Lane also filed a lengthy Memorandum of Law that again repeats facts, arguments, and claims. (ECF No. 1-1.) The Memorandum of Law includes Ground One with five subparts and Ground Two with four subparts. (*Id.* at 7–14, 16–21.) Lane's submissions are rambling and repetitive. Lane's presentation of his claims has complicated the Court's ability to examine them. The Court will not parse each submission for variants of argument or nuances of claims. Rather, the Court utilizes Lane's recitation of his claims and supporting argument solely from his attached Memorandum of Law which appears to be the most fulsome presentation. (*See* ECF No. 1-1.)

               (b) the "Commonwealth did not prove each essential element of the crimes Petitioner was charged with—specifically for armed burglary, robbery, and felony homicide" (*id.* at 8);
               (c) he was "denied to have a fair trial by the judge and the Commonwealth—whom unduly influenced the jury verdicts with the allowing and use of inadmissible evidence—which amounted to prosecutorial misconduct and abuse of discretion" (*id.* at 11);
               (d) he "was denied his right to have a fair, impartial jury" (*id.* at 14); and,
               (e) the Commonwealth used a "questionable identification . . . to identify Petitioner as a co-perpetrator of the crimes" (*id.* at 15).

**Claim Two:**    "Petitioner was denied [the] []effective assistance of counsel" (*id.* at 16); when:
               (a) "trial counsel failed to make jury aware of the change of material testimony of Dajanay Scott at the preliminary hearing [and] then at the trial by utilizing means of effective cross-examination" (*id.* at 17);
               (b) "[c]ounsel failed to make the jury aware of witness Dajanay Scott's change of identification of who shot her brother when he failed to utilize effective cross-examination and closing arguments" (*id.* at 18);
               (c) "[t]rial counsel failed to object and request curative instructions in regards to Petitioner's due process violations . . . and this failure served to undermine the fundamental fairness of his trial . . . [and] would have been properly preserved" for appeal" (*id.* at 19);
               (d) "[t]rial counsel failed to move to suppress the taped jail phone call of Petitioner and Ms. Melvina Banks" (*id.* at 21).

Respondent moves to dismiss on the ground, *inter alia*, that Lane's claims are either defaulted and barred from review here, are not cognizable on federal habeas review, or lack merit. Lane has responded. (ECF No. 14.) For the reasons set forth below, the Motion to Dismiss (ECF No. 10) will be GRANTED, the § 2254 Petition will be DENIED, and the action will be DISMISSED.

## I.    PROCEDURAL HISTORY

On January 7, 2016, a grand jury indicted Lane with first-degree murder, abduction, statutory burglary, five counts of use of a firearm in the commission of a felony, felony first-degree murder, and robbery. Indictment 1–3, *Commonwealth v. Lane*, No. CR15-1899 (Va. Cir. Ct. Jan. 7, 2016). Prior to trial, and upon the Commonwealth's motion, the Circuit Court agreed to dismiss the charges for first-degree murder and two counts of use of a firearm in the commission of a

felony. *See Lane*, No. CR15-1899, at 1–2 (Va. Cir. Ct. Apr. 15, 2016); (Mar. 28, 2016 Tr. 5–6). After a jury trial, Lane was convicted of the remaining seven counts. *See Lane*, CR15-1899, at 1–2 (Va. Cir. Ct. Apr. 15, 2016). On May 26, 2016, the Circuit Court sentenced Lane to a total of sixty-eight years and twelve months of incarceration, as fixed by the jury. *See Lane*, No. CR15-1899 (Va. Cir. Ct. June 16, 2016).

Lane appealed. On February 2, 2017, the Court of Appeals of Virginia denied the petition for appeal. *Lane v. Commonwealth*, No. 0972-16-1, at 1–7 (Va. Ct. App. Feb. 2, 2017). However, on June 29, 2017, a three-judge panel granted Lane's appeal with respect to one claim—that the Commonwealth had failed to prove the breaking element of the armed burglary count. *Lane*, No. 0972-16-1, at 1 (Va. Ct. App. June 29, 2017). On April 10, 2018, the Court of Appeals of Virginia affirmed the judgment of the Circuit Court. *Lane*, No. 0972-16-1, at 1–4 (Va. Ct. App. Apr. 10, 2018). On December 7, 2018, the Supreme Court of Virginia refused his petition for appeal. (*See* ECF No. 12, at 3.)

Lane filed a petition for a writ of habeas corpus in the Supreme Court of Virginia raising claims similar to Claim Two (a), (b), and (c) of his § 2254 Petition. *See Lane v. Clarke*, No. 171634, 1–4, 9–11 (Va. July 19, 2018). The Supreme Court of Virginia dismissed the habeas petition. *Id.* at 15. Lane subsequently filed the instant § 2254 Petition.

## II.    EXHAUSTION AND PROCEDURAL DEFAULT

Before a state prisoner can bring a § 2254 petition in federal district court, the prisoner must first have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). State exhaustion "is rooted in considerations of federal-state comity," and in Congressional determination via federal habeas laws "that exhaustion of adequate state remedies will 'best serve the policies of federalism.'" *Slavek v. Hinkle*, 359 F. Supp. 2d 473, 479 (E.D. Va. 2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 & n. 10 (1973)). The purpose of

3

exhaustion is "to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks omitted). Exhaustion has two aspects. First, a petitioner must utilize all available state remedies before he can apply for federal habeas relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–48 (1999). As to whether a petitioner has used all available state remedies, the statute notes that a habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

The second aspect of exhaustion requires a petitioner to have offered the state courts an adequate opportunity to address the constitutional claims advanced on federal habeas. "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)). Fair presentation demands that "both the operative facts and the controlling legal principles" must be presented to the state court. *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (quoting *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)). The burden of proving that a claim has been exhausted in accordance with a "state's chosen procedural scheme" lies with the petitioner. *Mallory v. Smith*, 27 F.3d 991, 994–95 (4th Cir. 1994).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). This doctrine provides that "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Id.* (citing

*Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)).   A federal habeas petitioner also procedurally defaults claims when the "petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Id.* (quoting *Coleman*, 501 U.S. at 735 n. 1).[2]  The burden of pleading and proving that a claim is procedurally defaulted rests with the state. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010) (citing cases).  Absent a showing of "cause for the default and actual prejudice as a result of the alleged violation of federal law," or a showing that "failure to consider the claims will result in a fundamental miscarriage of justice," this Court cannot review the merits of a defaulted claim. *Coleman*, 501 U.S. at 750; *see Harris v. Reed*, 489 U.S. 255, 262 (1989).

To exhaust his claims, Lane was required to present properly these claims to the Supreme Court of Virginia.  Lane did not present Claim One (b), (c), or (e) or Claim Two (d) to the Supreme Court of Virginia either on direct appeal or in his habeas appeal.   If Lane now attempted to raise Claim One (b), (c), or (e) or Claim Two (d) in the Supreme Court of Virginia in a habeas petition, that habeas petition would be barred as successive pursuant to section 8.01-654(B)(2) of the Virginia Code, and as untimely pursuant to section 8.01-654(A)(2) of the Virginia Code. Virginia's statute of limitations for habeas actions and the bar on successive habeas petitions are adequate and independent procedural rules when so applied. *See Clagett v. Angelone*, 209 F.3d 370, 379 (4th Cir. 2000); *Sparrow v. Dir., Dep't of Corr.*, 439 F. Supp. 2d 584, 587–88 (E.D. Va. 2006).  Thus, Claim One (b), (c), and (e), and Claim Two (d) are barred from review here unless Lane demonstrates cause for the default of his claims.  Lane fails to offer any persuasive reason

---

[2] Under these circumstances, even though the claim has not been fairly presented to the Supreme Court of Virginia, the exhaustion requirement is "technically met." *Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)).

why Claims One (b), (c), and (e) should be considered here.  Accordingly, for this reason alone Claims One (b), (c), and (e) are barred from review and will be DISMISSED.[3]

With respect to Claim Two (d), Lane argues for the first time in his § 2254 Petition that *trial* counsel "failed to move to suppress the taped jail phone call of Petitioner and Ms. Melvina Banks." (*Id.* at 21).  In his state habeas petition, Lane instead argued that he was denied the effective assistance of *appellate* counsel because counsel failed to provide the recording or transcript of the jail phone call. (*See* SCVA 43–48, 933.)[4]  Claim Two (d) is clearly defaulted because Lane failed to raise this claim before the Supreme Court of Virginia.  Nevertheless, because under *Martinez v. Ryan*, 566 U.S. 1 (2012), ineffective assistance of counsel or the lack of counsel "at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial," *id.* at 9, the Court will review the merits of this claim.

## III.    APPLICABLE CONSTRAINTS UPON HABEAS REVIEW

In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The Antiterrorism and Effective Death Penalty of 1996 ("AEDPA") further circumscribes this Court's authority to grant relief by way of a writ of habeas corpus.  Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear

---

[3] Lane challenged the sufficiency of the evidence on appeal, albeit through different claims. Out of an abundance of caution and because of the apparent lack of merit of his sufficiency claim, the Court reviews Claim One (b) in Part IV.  Moreover, as discussed in Part IV, Claim One (c) is also not cognizable in federal habeas review, and is too vague to state a claim for relief.

[4] The Court of Appeals of Virginia and the Supreme Court of Virginia numbered the pages of their record.  For ease of reference, the Court employs the pagination assigned by the Court of Appeals of Virginia ("CAVA Record") and the Supreme Court of Virginia ("SCVA Record") hereinafter, in its citation to the records.

and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C.

§ 2254(e)(1)).  Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of

habeas corpus based on any claim that was adjudicated on the merits in state court unless the

adjudicated claim:

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
> **(2)** resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has emphasized that the question "is not whether a

federal court believes the state court's determination was incorrect but whether that determination

was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473

(2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

## IV.    CLAIMS NOT COGNIZABLE IN FEDERAL HABEAS

In Claim One (a), Lane argues that he was "denied due process of law of his right to

confront [and] cross examine witnesses when . . . the trial judge abused his discretion and

committed plain error when he allowed inadmissible evidence (recorded testimony on a jail phone

call between Petitioner and Melvina Banks)." (ECF No. 1-1, at 7.)  In Claim One (c), Lane argues

that he was "denied to have a fair trial by the judge and the Commonwealth—whom unduly

influenced the jury verdicts with the allowing and use of inadmissible evidence—which amounted

to prosecutorial misconduct and abuse of discretion" (ECF No. 1-1, at 11), and, in Claim One (d),

that he "was denied his right to have a fair, impartial jury" (*id.* at 14).  Lane provides no supporting

details in the section where he outlines Claim One (c).  Rather, he simply cites law and vaguely

suggests that the Commonwealth knowingly used some unidentified perjured testimony. (*Id.* at

13).[5]  Under the heading for Claim One (d), Lane argues that that it was error to admit the recorded phone conversation between himself and Melvina Banks and this caused his trial to be unfair.  (*Id.* at 6.)  Although Lane frames these claims generally as a denial of due process, or "prosecutorial misconduct," he truly challenges the Circuit Court's determination of the admissibility of evidence, which is a determination of state law.  The trial court's alleged error provides no basis for federal habeas corpus relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (citations omitted) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010).  Because Claim One (a), (c), and (d) challenge the Circuit Court's ruling on the admissibility of evidence, these claims state no basis for federal habeas relief.[6]  Accordingly, Claim One (a), (c), and (d) will be DISMISSED.

## V.    SUFFICIENCY OF THE EVIDENCE

In Claim Two (b), Lane vaguely challenges the sufficiency of the evidence to convict him.  Lane argues that "the Commonwealth did not prove each essential element of the crimes Petitioner was charged with, specifically for armed burglary, robbery and felony homicide."[7]  (ECF No. 1-1,

---

[5] Claim One (c) also may be dismissed because it is too vague and conclusory to state a claim for federal habeas relief.  *See Sanders v. United States*, 373 U.S. 1, 19 (1963) (finding denial of habeas relief appropriate where petitioner "stated only bald legal conclusions with no supporting factual allegations").

[6] Claims One (a) and (d) both appear to relate to the Circuit Court's admission of the recording of the phone call between Lane and Melvina Banks.  In Claim Two (d), Lane raises a claim that counsel was ineffective for failing to ensure the recording of the phone call with Melvina Banks was not admitted during trial.  This claim is reviewable in federal habeas and is addressed in Part VI.  Moreover, to the extent Lane adequately alleges a due process claim that would be reviewable in federal habeas in Claims (a) and (d), nothing about the admission of the recording rendered his trial fundamentally unfair as to deny him due process.  *See Estelle*, 502 U.S. at 67–70; Part VI.

[7] Lane refers to felony first-degree murder, of which he was convicted, as "felony homicide."

at 8.)  As discussed below, on direct appeal, Lane challenged the sufficiency of the evidence with respect to these three convictions and the Court of Appeals of Virginia found his claims lacked merit.

### A.   Standard of Review for Sufficiency of the Evidence Claims

In conducting the present federal habeas review, the findings of fact by the Circuit Court and the Court of Appeals of Virginia are presumed correct.  *See* 28 U.S.C. § 2254(e); *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008).  Lane has the burden of rebutting that presumption by clear and convicting evidence.  *See* § 2254(e)(1).

Unlike Lane's reasoned challenges to the sufficiency of the evidence on appeal, Lane's allegations here are quite vague and appear to raise issues that were not raised before the state courts.  Nevertheless, because of the apparent lack of merit, the Court will review these claims. The crux of Lane's claim is that the testimony of witness Dajanay Scott was not credible because she did not physically see the armed burglary, robbery, or felony first-degree murder occur, and that her testimony was insufficient to prove that he had committed the three crimes.  (ECF No. 1-1, 7–10.)  Contrary to Lane's desire here, federal courts sitting in habeas have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."  *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) (citation omitted); *see United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983) (citations omitted) (holding that federal habeas courts, when making a sufficiency of the evidence determination, do not weigh the evidence or review the credibility of witnesses).  Accordingly, the Court will not engage in a lengthy discussion of whether Scott was a credible witness, a matter that has already been decided by the jury.

Instead, a federal habeas petition warrants relief on a challenge to the sufficiency of the evidence only if "no rational trier of fact could find [proof of] guilt beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 317 (1979).  The relevant question in conducting such a review is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)).  The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id.* at 318.  Despite Lane's arguments to the contrary, the evidence was sufficient for any rational factfinder to have found him guilty of armed burglary, robbery, and felony first-degree murder.

### B.   Armed Burglary

In rejecting Lane's sufficiency of the evidence arguments with regards to armed burglary, the Court of Appeals of Virginia aptly found:

> Appellant argues that the trial court erred by finding that the evidence was sufficient to prove that he committed armed burglary because "the Commonwealth's proof lacked evidence of a breaking."
>
> "When considering on appeal the sufficiency of the evidence presented below, we 'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence to support it.'" *Kelly v. Commonwealth*, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting *Davis v. Commonwealth*, 39 Va. App. 96, 99, 570 S.E.2d 875, 876–77 (2002)).  "On appeal, we will consider the evidence in the light most favorable to the Commonwealth, as it prevailed in the trial court." *Whitehurst v. Commonwealth*, 63 Va. App. 132, 133, 754 S.E.2d 910, 910 (2014).
>
> So viewed, the evidence proved that on August 20, 2015, appellant and Christian Burden entered into Antonio Scott's residence as a woman was leaving.  Antonio told appellant and Burden, "You're not coming in here."  Appellant and Burden were armed with guns when they entered the house.  Appellant and Antonio immediately began fighting.  Dajanay Scott, Antonio's sister, heard them fighting and then heard a gunshot.  Dajanay hid under a bed and heard several more gunshots.  Burden lifted up the bed and held Dajanay at gunpoint.  Dajanay saw her brother lying on the floor and suffering from several gunshot wounds.  Appellant tried to get into Antonio's bedroom, but it was locked.  Appellant took a key from Antonio's pocket, and appellant used the key to enter Antonio's bedroom.  Appellant asked Dajanay to help him look through Antonio's bedroom.  Appellant found a bag of marijuana and took it.  Before leaving, appellant said, "I shot him over this little bit of shit."  Appellant and Burden left the residence.  When the

police and paramedics arrived, they announced Antonio dead. An autopsy confirmed that Antonio's cause of death was several gunshot wounds to the torso.

At the conclusion of the Commonwealth's evidence, appellant made a motion to strike, which the trial court denied.

Then, appellant presented evidence in an attempt to establish an alibi. He testified that he was with his infant son and his cousin, Jeffrey Dunbar, at an apartment in Norfolk at the time of the shooting. Dunbar testified on behalf of the appellant. Tiara Wilson, the mother of the appellant's infant son, also testified on appellant's behalf and said that appellant came to her house to pick up the baby.

In rebuttal, the Commonwealth offered a recording of a phone call between appellant and Melvina Banks, who was the mother of another one of appellant's children. The Commonwealth also offered evidence from Myron Delbridge, who testified that appellant told him that he was calling Wilson as a false alibi witness and arranged to keep Banks from testifying against him. Detective Branch testified that he spoke with Banks earlier in his investigation, but then he was unable to locate her.

At the conclusion of all of the evidence, appellant renewed his motion to strike, which the trial court denied. The jury found appellant guilty of statutory burglary with a deadly weapon, abduction, first-degree felony murder, robbery, and three counts of use of a firearm in the commission of a felony. The trial court followed the jury's recommendation for sentencing, and appellant was sentenced to a total of sixty-eight years and twelve months.

Appellant argues that the evidence was insufficient to prove that he was guilty of armed burglary. Appellant contends the Commonwealth did not prove that there was a breaking when appellant entered Antonio's residence.

Code § 18.2-90 states:

> If any person in the nighttime enters without breaking or in the daytime breaks and enters or enters and conceals himself in a dwelling house or an adjoining, occupied outhouse or in the nighttime enters without breaking or at any time breaks and enters or enters and conceals himself in any building permanently affixed to realty, or any ship, vessel or river craft or any railroad car, or any automobile, truck or trailer, if such automobile, truck or trailer is used as a dwelling or place of human habitation, with intent to commit murder, rape, robbery or arson in violation of §§ 18.2-77, 18.2-79 or § 18.2-80, he shall be deemed guilty of statutory burglary, which offense shall be a Class 3 felony. However, if such person was armed with a deadly weapon at the time of such entry, he shall be guilty of a Class 3 felony.

"A 'breaking' under burglary law can be 'either actual or constructive.'" *Lay v. Commonwealth*, 50 Va. App. 330, 334, 649 S.E.2d 714, 715 (2007) (quoting *Bao Quoc Doan v. Commonwealth*, 15 Va. App. 87, 99, 422 S.E.2d 398, 404 (1992)). "Actual breaking requires the use of physical force, often against some

structural aspect of the entry portal." *Id.* at 334, 649 S.E.2d at 716 (citing *Johnson v. Commonwealth*, 221 Va. 872, 876, 275 S.E.2d 592, 594–95 (1981)).

> On the other hand, constructive breaking can include fraud, threats, trickery, conspiracy, or some other nefarious conduct designed to prompt the victim to let the burglar inside. *See Johnson*, 221 Va. at [] 876, 275 S.E.2d at 594; *Bao Quoc Doan*, 15 Va. App. at 99, 422 S.E.2d at 404–05 (distinguishing "physical force" from "threats, fraud or conspiracy" and finding either category sufficient to prove a breaking). When an intimidated or defrauded victim "opens the door and the thief enters, such entry will amount to breaking in law; for which some have given as a reason, that the opening of the door by the owner being occasioned by the felonious attempt of the thief, is as much imputable to him as if it had been done actually by his own hands." *Clarke v. Commonwealth*, 66 Va. (25 Gratt.) 908, 912 (1874) (citing Russell on Crimes 792). Constructive breaking principles thus recognize that, while the burglar may not technically use actual, physical force to gain entry, "the law will not suffer itself to be trifled with such evasions . . . ." 4 William Blackstone, Commentaries on the Laws of England 226 (1769).

*Id.* at 335, 649 S.E.2d at 716.

In this case, the evidence proved that Antonio closed and locked the front door when he came home. A woman stated that she was going to get something out of the car and would be right back. As she was leaving Antonio's residence, appellant and Burden entered the house with firearms. Antonio told them, "You're not coming in here." Appellant and Antonio immediately started fighting, and Antonio was shot several times.

Although the evidence does not prove that appellant committed an actual breaking, there was sufficient evidence to prove a constructive breaking. The front door to Antonio's home was closed and locked. Appellant and Burden burst into Antonio's residence as a woman was leaving. Antonio told them that they could not come in the house, but they entered and fought with Antonio.

Based on the evidence, the trial court did not err in denying the motion to strike the armed burglary charge.

(CAVA Record 39–42 (omission in original)).

In its panel decision of this claim, the Court of Appeals of Virginia further explained:

At trial, Myron Delbridge ("Delbridge"), a fellow inmate incarcerated with Lane at Hampton Roads Regional Jail, testified that Lane had turned to him for advice. Delbridge testified that Lane told him he and Burden had gained access to the house

through a "young lady" who opened the door for them on the pretense that she was getting her phone charger. As this "young lady" left the house, Lane and Burden "bum rushed the house." . . . .

    . . . .

    Lane argues that no breaking occurred because the evidence lacked proof of force or deception of Antonio to gain entry. It is true that Dajanay could not see the door from her position, and therefore cannot say whether Lane or Burden applied any force to the door, but she did hear the unknown woman tell Antonio that she was retrieving her phone charger from the car. In conjunction with Delbridge's testimony, this evidence, taken in the light most favorable to the Commonwealth, supports the finding that the unknown woman was part of a plan by Lane and Burden to gain access to the house. Though there are a few cases in our jurisprudence outlining constructive breaking, the use of the unknown woman to gain access fits squarely within the bounds of "fraud, threats, trickery, conspiracy, or some other nefarious conduct designed to . . . let the burglar inside." [*Lay*, 649 S.E.2d at 716]. This Court has held that "[a] breaking occurs when an accomplice opens a locked door from within to enable his cohorts to commit a theft or by leaving a door or window open from within to facilitate a later entry to commit a crime." *Bruce v. Commonwealth*, 22 Va. App. 264, 270, 469 S.E.2d 64, 68 (1996). This is precisely what the testimony in the light most favorable to the Commonwealth shows. In short, "[t]he gravamen of the offense is breaking the close or the sanctity of the residence, which can be accomplished from within or without." *Id.*

    Furthermore, actual and constructive breakings are not mutually exclusive. In *Johnson*, our Supreme Court held that a breaking was both constructive and actual where the defendant had gained access to the house by claiming he was there to fix electrical fuses and widening the slightly ajar door when the resident went to get him a requested glass of water. *See Johnson*, 221 Va. at 876, 275 S.E.2d at 595. The situation here is similar. The record indicates that Antonio locked the door when he came into the house with the groceries. Whether the unknown woman with him merely ensured the door was unlocked for Lane and Burden or opened it for them is unknown, but either scenario constitutes a breaking.

(CAVA 235–37 (second and third alteration in original) (third omission in original).)[8] The Court

of Appeals of Virginia then found that "[t]he evidence was clearly sufficient to show that a

breaking occurred," and affirmed the Circuit Court's judgment. (*Id.* at 237.)

    Lane appears to argue now for the first time that Dajanay Scott's testimony only

demonstrated that Lane "was trespassing, while having a gun." (ECF No. 1-1, at 10.) Lane's

---

[8] The decision of the Court of Appeals of Virginia was the last reasoned state court decision addressing these claims, and its reasoning is imputed to the Supreme Court of Virginia, which refused further review without discussion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

argument is entirely lacking in merit. Contrary to Lane's suggestion, the evidence was sufficient for any rational factfinder to have found him guilty of armed burglary. The evidence clearly established that Lane entered the home after the victim told him he could not come in and this amounted to constructive breaking. Lane was armed with a deadly weapon and entered the home with the intent to rob the victim as discussed in greater detail in Part V.C. (Mar. 28, 2016 Tr. 93–95, 115.) Therefore, as aptly summarized by the Court of Appeals of Virginia, the evidence presented at trial was sufficient for any rational factfinder to convict Lane of armed burglary. Therefore, upon review of the record in this case, the Court concludes that the Court of Appeals of Virginia's decision was not an unreasonable determination of the facts in light of the evidence presented at trial. *See* 28 U.S.C § 2254(d). Moreover, any argument raised by Lane for the first time here lacks merit because the evidence was sufficient to convict him of armed burglary.

### C. Robbery

Lane vaguely suggests that the evidence was insufficient to establish that he was guilty of robbery. Lane contends that Scott initially stated that nothing was missing from the house, but later changed her testimony "to say that [Lane] took a bag of marijuana." (ECF No. 1-1, at 10.) In rejecting a claim challenging the sufficiency of the evidence with respect to robbery, the Court of Appeals of Virginia explained:

> Appellant argues that the trial court erred by finding that the evidence was sufficient to prove that he committed robbery of Antonio Scott because "the Commonwealth's evidence failed to prove the violence associated with the taking occurred at the time of the taking."
>
> "Robbery is 'the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation.'" *Branch v. Commonwealth*, 225 Va. 91 94, 300 S.E.2d 758, 759 (1983) (quoting *Jones v. Commonwealth*, 172 Va. 615, 618, 1 S.E.2d 300, 301 (1939)). "If the violence or intimidation preceded or was concomitant with the taking, the offense of robbery is established; if the taking was accomplished before the violence toward or intimidation of [the victim] then it was not robbery." *Mason v. Commonwealth*, 200 Va. 253, 255, 105 S.E.2d 149, 151 (1958).

The evidence proved that appellant and Burden entered Antonio's house with guns. Appellant immediately started fighting with Antonio, and Antonio was shot. Appellant tried to get into Antonio's bedroom and took the keys from Antonio in order to gain access. Once in Antonio's bedroom, appellant looked for and found a bag of marijuana. Appellant stated, "I shot him over this little bit of shit."

Based on this evidence, the jury could infer that appellant and Burden entered Antonio's house with the intent to steal the marijuana. Appellant fought and shot Antonio in order to steal the marijuana. Contrary to appellant's argument's the evidence proved that the violence against Antonio preceded the taking of the marijuana. Appellant's actions and comments indicate that he and Burden intended to steal the marijuana when they force their way into Antonio's house. The trial court did not err in denying the motion to strike the robbery charge.

(CAVA Record 43 (alteration in original).)

The evidence clearly established that Lane forced his way into Antonio Scott's home, fought with and shot Antonio Scott, took the keys to a locked room from Antonio Scott's pocket, unlocked the door, and then took the marijuana from the locked room. Dajanay Scott testified that after the shooting, Lane searched for the keys to her brother's locked bedroom in order to obtain access to the room. (Mar. 28, 2014 Tr. 102–04, 120–21.) After looking in the room, Lane came back down the stairs asking, "Where is it? Where is it?" and he subsequently forced Scott come upstairs and "help him look for it." (Mar. 28, 2016 Tr. 104, 123.) Scott then observed Lane with a bag of marijuana that Lane put in his pants. (Mar. 28, 2016 Tr. 105.) Scott testified that she explained to Lane that if the bag of marijuana was all he found "I can't look for anything else, because it's nothing else here." (Mar. 28, 2016 Tr. 124–25.) Thus, the evidence establishes that Lane broke into the house with the intent to rob Antonio Scott.

Therefore, upon review of the record in this case, the Court concludes that the Court of Appeals of Virginia's decision was not an unreasonable determination of the facts in light of the evidence presented at trial. *See* 28 U.S.C § 2254(d). In addition, any argument raised by Lane for the first time in his § 2254 Petition lacks merit because the evidence was sufficient to convict him of robbery.

15

### D.    Felony First-Degree Murder

Lane also generally challenges the sufficiency of the evidence with respect to the count of

felony first-degree murder.  In rejecting a similar claim on appeal, the Court of Appeals of Virginia

aptly explained:

> Appellant argues that the trial court erred by finding that the evidence was
> sufficient to prove that "Antonio Scott as killed during the commission of a felony."
> Appellant contends Antonio was not killed during the commission of a burglary
> because Antonio was not killed as appellant and Burden entered the house.  He
> further asserts that the evidence did not prove a robbery occurred, so Antonio was
> not killed in the commission of a robbery.
>> Code § 18.2-32 states:
>>> Murder, other than capital murder, by poison, lying
>>> in wait, imprisonment, starving, or any any willful,
>>> deliberate, and premeditated killing, or in the
>>> commission of, or attempt to commit, arson, rape,
>>> forcible sodomy, inanimate or animate object sexual
>>> penetration, robbery, burglary or abduction, except
>>> as provided in § 18.2-31, is murder of the first
>>> degree, punishable as a Class 2 felony.
>> "'The rule which we adopt,' the Virginia Supreme Court has declared, 'is
>> that the felony-murder statute applies where the killing is so closely related in time,
>> place, and causal connection as to make it a part of the same criminal enterprise.'"
>> *Kennemore v. Commonwealth*, 218 Va. 1033, 1043–44, 243 S.E.2d 477, 483
>> (1978)).  "If the events are sufficiently related, the killing can take place 'before,
>> during, or after' the felony." *Id.* (quoting *Hoke v. Netherland*, 92 F.3d 1350, 1363
>> (4th Cir. 1996)).
>> As discussed above, the evidence was sufficient to prove that appellant
>> committed a burglary and a robbery and that he shot and killed Antonio.  All of
>> these events were sufficiently related in time, place, and causal connection.
>> Therefore, the trial court did not err in denying the motion to strike the felony
>> murder charge.

(CAVA Record 44.)

Lane now contends that the evidence was insufficient to convict him of felony first-degree

murder because Dajanay Scott did not actually see which of the two men fired the fatal shot to her

brother because she was hiding under the bed.  (ECF No. 1-1, at 10.)  However, Dajanay Scott

clearly saw Lane with a gun in his hand while he was fighting with her brother, and she observed

Lane fire the gun.  (Mar. 28, 2016 Tr. 94–95.)  Dajanay Scott then hid under the bed, heard three

more gunshots a mere "[s]econds after the first one," and then she heard her brother say that "he shot me" and he fell to the floor. (Mar. 28, 2016 Tr. 95–96, 117–18.) Dajanay Scott also testified that she saw both men with firearms in their hands after she heard the additional bullets fired. (Mar. 28, 2016 Tr. 98.) Although Lane makes much of the fact that Dajanay Scott did not see who "delivered either of these fatal shots" (ECF No. 1-1, at 10–11), a reasonable juror could infer that both men killed Antonio Scott. Dajanay Scott clearly testified that Burden told her: "Be quiet. Shut up. I only shot him in the leg. He's not dead." (Mar. 28, 2016 Tr. 103.) Dajanay Scott also testified that she later heard Lane say, "I shot him over this little bit of shit." (Mar. 28, 2016 Tr. 104.) Antonio Scott suffered several gunshot wounds in his abdomen and back, and several in his leg. (Mar. 28, 2016 Tr. 198.)[9] The shots that caused the wounds in the abdomen were fired from opposite directions (Mar. 28, 2016 Tr. 202–08, 211–13), and Antonio Scott's cause of death was determined to be shots to his torso. (Mar. 28, 2016 Tr. 213). Myron Delbridge, who was incarcerated with Lane, also testified that Lane told him about the crimes and indicated that Lane stated that he "kept tussling with the dude, and then finally [Lane] got some shots off, I think he said, twice in the leg and few times up here." (Mar. 29, 2016 Tr, 98.) Thus, based on the evidence presented at trial, a jury could reasonably determine that both men shot and killed Antonio Scott.

Therefore, upon review of the record in this case, the Court concludes that the Court of Appeals of Virginia's decision was not an unreasonable determination of the facts in light of the evidence presented at trial. *See* 28 U.S.C § 2254(d). Moreover, any argument raised by Lane for the first time here lacks merit because the evidence was sufficient to convict him of felony first-degree murder.

---

[9] The cartridges and casings recovered from the house were all forty-caliber. (Mar. 28, 2016 Tr. 143–45.)

As aptly summarized by the Court of Appeals of Virginia, the evidence presented at trial was sufficient for any rational factfinder to convict Lane of armed burglary, robbery, and felony first-degree murder.  Accordingly, Claim One (b) lacks merit and will be DISMISSED.

## VI.    INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient and, second, that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'"  *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).  The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice.  *Id.* at 697.

In Claim Two (a), Lane contends that trial counsel was ineffective because he "failed to make jury aware of the change of material testimony of Dajanay Scott at the preliminary hearing [and] then at the trial by utilizing means of effective cross-examination."  (ECF No. 1-1, at 17.)  Lane raised this claim in his habeas petition before the Supreme Court of Virginia.  In rejecting this claim, the Supreme Court of Virginia explained as follows:

> In claim (a), petitioner contends he was denied the effective assistance of counsel because counsel did not attempt to impeach one of the victim's Dajanay Scott, based on inconsistencies between her preliminary hearing testimony and her trial testimony regarding the robbery.  Petitioner alleges Scott changed her prior testimony regarding petitioner's location in the house when he ordered her to assist

18

him in locating money. Petitioner also alleges Scott testified for the first time at trial that petitioner stole marijuana from her brother's room. Petitioner alleges Scott testified during cross-examination at the preliminary hearing that she could not recall if there were any narcotics in the house she shared with her brother at the time of the offenses, she did not know what the intruders were looking for, petitioner had nothing in his possession when he left her brother's room, petitioner came down the stairs and into her bedroom to tell her to help him search her brother's bedroom, and she did not find anything missing from the home.[10] Petitioner alleges this testimony is inconsistent with Scott's testimony at trial when she stated petitioner was upstairs when he directed her to help search the bedroom and that when she got upstairs she saw petitioner stuff a bag of marijuana into his pants while telling her, "I shot him over this little bit of shit." Petitioner contends he would not have been convicted of robbery if counsel had confronted Scott with her prior inconsistent testimony, although he appears to concede he would have been convicted of the lesser offense of attempted robbery.

The Court holds claim (a) fails to satisfy the "performance" prong of the two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668, 687 (184). The record, including the trial transcript demonstrates that on August 20, 2015, Scott saw her brother, Antonio Scott ("Antonio"), enter[ed] the house with her seven-year old niece and with a woman she did not know. While Scott talked with Antonio, the woman sat on [the] sofa and used her phone. Scott then heard the woman tell Antonio she needed to get her phone charger from the car. As the woman opened the door, two men Scott later identified as Christian Burden and petitioner entered the house carrying firearms. Scott saw petitioner holding a firearm while struggling in the hallway with Antonio. During this struggle, Scott saw petitioner discharge his weapon and she dropped to the floor where she hid underneath a bed. While hiding, Scott heard three more gunshots. After the shooting stopped, Burden found Scott and held her at gunpoint for several minutes whole petitioner attempted to gain entry to a locked upstairs bedroom. Petitioner checked Antonio's body and found a key to the bedroom in his pocket. Petitioner then entered the bedroom, took a bag of marijuana, and subsequently fled the house with Burden. Scott was not harmed and was able to call the police after the men left. Antonio was shot five times and died as a result. Police found one of Burden's palm prints inside the house.

Five days after the preliminary hearing, jail staff found two notes petitioner wrote to Burden in which he pleaded with Burden not to implicate him the crimes. While awaiting trial, petitioner made inculpatory statements to a fellow inmate, Myron Delbridge. Delbridge testified petitioner told him that petitioner and Burden

---

[10] Petitioner quotes extensively from a purported transcript of the December 2, 2015 preliminary hearing. On January 8, 2016, pursuant to trial counsel's motion, the trial court entered an order for production of this transcript. However, no such transcript was filed in the trial court nor was it otherwise made part of the record. Petitioner did not include the purported transcript as an exhibit with his petition for writ of habeas corpus, and the Court denied his motion, filed after the respondent's motion to dismiss, to admit pages from the preliminary hearing transcript as part of the record in this case.

gained access to the house through a "young lady" who pretended she had left a phone charger in the house. Delbridge also testified petitioner told him a woman inside the house "ran up under the bed" and that he shot a man inside the house multiple times while struggling with him. Delbridge testified petitioner told Delbridge he tried to make the woman in the house tell him "where everything was at."

Counsel presented an alibi defense at trial and contended petitioner was with his infant son and cousin, Jeffrey Dunbar, in Norfolk at the time of the crime. Petitioner offered evidence that on the day of the crime he was in Virginia Beach to obtain a Transportation Worker Identification Credential ("TWIC") card. Petitioner produced a receipt for the TWIC card issued at 12:49 p.m. on August 20, 2015 — approximately two hours before the offenses were committed in Portsmouth. The receipt also contained petitioner's name. Petitioner testified he traveled to Virginia Beach with Dunbar to obtain the TWIC card, which he needed to join the Merchant Marines. After obtaining the card, petitioner traveled to Norfolk, where Dunbar met with his probation officer. Petitioner testified that after this meeting, he went to eat with Dunbar, but he did not identify the location. The pair then went to get petitioner's infant son and took the child to Dunbar's sister's apartment in Norfolk, where they remained during the time the offenses were committed in Portsmouth. Later in the evening, petitioner returned his son.

Dunbar's testimony corroborated petitioner's account of his whereabouts on the day of the crime. Dunbar testified he and petitioner went to McDonald's at approximately 2:00 p.m., after leaving the probation office, then collected petitioner's son at approximately 2:30 p.m., and the men stayed with the child at Dunbar's sister's apartment until after 7:30 p.m., when they returned the child to his mother. Tiara Wilson, the mother of petitioner's son, also testified petitioner came to her house to get their child on August 20, 2015, after 2:00 p.m., and returned him some point later that evening. Wilson also presented text messages she exchanged with petitioner on that day regarding a visit with their son.

During the Commonwealth's rebuttal, the Commonwealth recalled Delbridge, who testified petitioner told him about a plan to create an alibi defense and to prevent a witness who could implicate him in the crimes from testifying against him. Petitioner also told Delbridge he planned to use the mother of one of his children as an alibi witness and that the mother of another one of his children could place him at the crime scene, but he would ensure she did not come to court.

During Scott's testimony, counsel did not attempt to impeach her with the inconsistencies that petitioner alleges existed between her trial testimony and her testimony during the preliminary hearing. Instead, counsel vigorously cross-examined Scott regarding the method by which she identified petitioner as one of the perpetrators in an attempt to persuade the jury Scott felt pressured into identifying her brother's murderer and misidentified petitioner because of her flawed memory. Thus, petitioner's theory of the case was that he was not present at the scene and had been mistakenly identified as a perpetrator by Scott, not that he committed the lesser offense of attempted robbery. Whether Scott actually saw petitioner take drugs or money from the house, and the inconsistencies petitioner describes in Scott's testimony regarding her knowledge of whether there were drugs in the house, where petitioner was when he ordered her to help him search

Antonio's room, and whether he took anything, would not have advanced the alibi theory he presented at trial.

Petitioner does not claim counsel selected an alibi theory after anything less than complete investigation and a full appreciation of the facts, and, thus, the reasonableness of counsel's choice is all but unassailable. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("Strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.") (internal quotation marks and citations omitted). Having chosen a reasonable theory of defense, counsel was not required to argue alternative or inconsistent theories of petitioner's innocence as to the robbery charge. *See Jackson v. Shanks*, 143 F.3d 1313, 1320 (10th Cir. 1998) ("Trial counsel's decision not to present inconsistent defense theories does not constitute ineffective assistance."). Thus, petitioner has filed to demonstrate that counsel's performance was deficient.

(SCVA Record 921–24 (footnote number altered from original)). The Court discerns no unreasonable application of the law and no unreasonable determination of the facts by the Supreme Court of Virginia in the dismissal of Claim Two (a). *See* 28 U.S.C. § 2254(d)(1)–(2).

Trial counsel reasonably determined that advancing a defense theory of an alibi was the best strategic choice in light of his client's insistence that he was in Virginia Beach and Norfolk on the day and time of the crimes. Lane also had several witnesses placing him in Norfolk during the time of the crimes. Consistent with that theory, counsel chose to cross-examine Dajanay Scott about her ability to identify Lane as the perpetrator. (Mar. 28, 2016 Tr. 125–31.) Highlighting inconsistencies in Scott's testimony about her observation of the crimes would only serve to undermine the defense theory that Lane was not at the crime scene. Thus, Lane fails to demonstrate that counsel was deficient. Although the Supreme Court of Virginia only dismissed this claim based on counsel's lack of deficiency, Lane also fails to show that there was any resulting prejudice from counsel's refusal to question Scott about inconsistences in her testimony. Accordingly, Claim Two (a) lacks merit and will be DISMISSED.

In Claim Two (b), Lane faults counsel for "fail[ing] to make the jury aware of witness Dajanay Scott's change of identification of who shot her brother when he failed to utilize effective

cross-examination and closing arguments." (ECF No. 1-1, at 18.) In rejecting this claim, the

Supreme Court of Virginia explained:

> In claim (c), petitioner contends he was denied the effective assistance of counsel because counsel did not inform the jury that Scott changed her identification of petitioner as the person who shot her brother. Petitioner alleges Scott initially testified that petitioner shot her brother, but later contradicted this identification by testifying Burden shot her brother.
>
> The Court hold[s] claim (c) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland*. The record, including the trial transcript, demonstrates Scott testified she saw petitioner holding a firearm while struggling in a hallway with her brother. Scott testified that during this struggle petitioner discharged his weapon. After this gunshot, Scott dropped to the floor and hid underneath a bed. While hiding, Scott heard three more gunshots. Scott did not testify who fired the three additional gunshots. Scott testified that, while Burden held her at gunpoint downstairs, she was screaming and crying over her brother and Burden told her, "Be Quiet. Shut up. I only shot him in the leg. He's not dead." Accordingly, Scott merely recounted what Burden said to calm her down and did not change her testimony to state Burden shot her brother, instead of petitioner. In light of this testimony, counsel could reasonably have determined he had no basis to argue Scott shifted her identification of the shooter from petitioner to Burden. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

(SCVA Record 929.) The Court discerns no unreasonable application of the law and no

unreasonable determination of the facts by the Supreme Court of Virginia in the dismissal of Claim

Two (b). *See* 28 U.S.C. § 2254(d)(1)–(2).

Lane fails to identify an instance in which Scott changed her testimony about who shot

Antonio Scott. Scott testified that she did not see the shots fired at her brother, thus it is unclear

how she could "change" her identification of who shot her brother. Rather, Scott testified that she

observed both men with guns and she simply recounted what both Burden and Lane said to her

about shooting her brother. Counsel cannot be faulted for failing to highlight a change in testimony

that did not happen. Thus, Lane fails to demonstrate any deficiency of counsel or resulting

prejudice. Accordingly, Claim Two (b) will be DISMISSED.

In Claim Two (c), Lane contends that "[t]rial counsel failed to object and request curative instructions in regard to Petitioner's due process violations . . . and this failure served to undermine the fundamental fairness of his trial . . . [and] would have been properly preserved" for appeal." (ECF No. 1-1, at 19.) Lane's claim as presented here appears to be two parts. Lane first argues that it was error for the Circuit Court to admit the evidence of Burden's fingerprints into Lane's trial when the trials of the two men had been severed by the Circuit Court, and he faults counsel for not objecting to the fingerprints' admission. (*Id.* at 20–21.) Lane also vaguely suggests that "the Commonwealth knew that Christian Burden . . . would have to incriminate himself" in order to "testify as an alibi witness" at Lane's trial, and counsel failed to "ask for a curative instruction" that would explain that Burden was invoking his Fifth Amendment right. (*Id.* at 21.) In rejecting both aspects of this claim, the Supreme Court of Virginia held:

> In a portion of claim (d), petitioner contends he was denied the effective assistance of counsel because counsel did not object to the admission of evidence that Burden's fingerprints were found at the crime scene on the ground that the trial court severed Burden's charges from petitioner's trial and thus the prints were not relevant.
> The Court holds this portion of claim (d) satisfies neither the "performance" not the "prejudice" prong of the two-part test enunciated in *Strickland*. The record, including the trial transcript, demonstrates Scott identified petitioner and Burden as the intruders who acted in concert during the commission of the offenses. Further, the evidence against petitioner included inculpatory statements about the crime he made to a fellow inmate and notes he wrote to Burden in which petitioner pleaded with Burden not to implicate him in the crimes. Accordingly, counsel could have reasonably determined the physical evidence linking Burden to the crime scene was relevant to establish petitioner was at the crime scene and that he had no basis to object to the admissibility of such evidence. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonably probability that, but for counsel's alleged error, the result of the proceeding would have been different.
> . . . .
> In another portion of claim (d), petitioner contends he was denied the effective assistance of counsel because counsel failed to object and request a curative instruction after the prosecutor asked petitioner during cross-examination whether Burden would be an alibi witness for petitioner at trial. Petitioner contends this question was improper because Burden would have necessarily incriminated himself by testifying as an alibi for petitioner and the prosecutor used Burden's

exercise of his right against self-incrimination to suggest Burden would not testify on petitioner's behalf.

The Court holds this portion of claim (d) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland*. The record, including the trial transcript, demonstrates that, after petitioner explained he only wrote to Burden because he did not know Burden was involved in the crimes and was surprised by the evidence that his prints were found at the scene, the prosecutor asked petitioner to read a portion of a note petitioner wrote to Burden suggesting Burden should testify on petitioner's behalf that petitioner "won't there." The prosecutor then asked petitioner if Burden was "here as a witness for" petitioner, to which petitioner responded he was not. The prosecutor then asked if Burden was one of petitioner's "alibi witnesses" and petitioner responded that he was not.

The Fifth Amendment of the United States Constitution declares that no person "shall be compelled in any criminal case to be a witness against himself." Article I, Section 8 of the Constitution of Virginia contains a comparable provision. Any comment made by a prosecutor "referring to the defendant's election not to testify is a violation of his rights against self-incrimination." *Johnson v. Commonwealth*, 236 Va. 48, 50 (1988). Comment on the decision of a potential witness not to testify does not, however implicate the accused's rights against self-incrimination. Counsel could have reasonably determined any argument that the comment was improper would have been futile. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

(SCVA Record 929–31.) The Court discerns no unreasonable application of the law and no unreasonable determination of the facts by the Supreme Court of Virginia in its rejection of Claim Two (c). *See* 28 U.S.C. § 2254(d)(1)–(2).

The "core protection afforded by the Self-incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004). Lane chose to testify in his own defense to establish an alibi, thus he was not compelled to testify. Lane was not entitled to an instruction on Burden's invocation of his Fifth Amendment rights in Lane's trial, as the Fifth Amendment only protects self-incrimination. Therefore, the Court fails to discern how the Fifth Amendment is implicated here.

During Lane's testimony, the Commonwealth asked Lane about the letters that were found in his pocket in the jail that were written to Christian Burden. The letters appeared to be an attempt

to persuade Burden not to implicate Lane in the crimes and to take sole blame because his fingerprints were found at the scene. (Mar. 29, 2016 Tr. 212–15.) The Commonwealth then asked whether Burden was an alibi witness at trial, and Lane admitted that he was not. (Mar. 29, 2016 Tr. 215.) The Court fails to discern how this question was improper or on what ground counsel could have objected to this question. Moreover, if counsel had raised some objection, he risked drawing further attention to the fact that Burden would not provide Lane with any alibi testimony but would instead implicate Lane if he testified. The Court also fails to discern on what ground counsel could have objected to the admission of Burden's fingerprints. Therefore, Lane fails to establish any deficiency of counsel or resulting prejudice. Accordingly, Claim Two (c) lacks merit and will be DISMISSED.

In Claim Two (d), Lane asserts that "[t]rial counsel failed to move to suppress the taped jail phone call of Petitioner and Ms. Melvina Banks." (*Id.* at 21.) Lane provides little argument as to why he believes his counsel was ineffective beside his general discontent with the trial court's admission of this evidence. Lane argues:

> In the instant case, when the trial court abused its discretion and allowed the Commonwealth to put into the evidence, a jail recorded phone conversation between Petitioner and Melvina Banks, although defense counsel did object, he did not move to have the tape suppressed as illegal evidence. The failure to move to suppress this tape caused the Petitioner fundamental unfairness at his trial . . .

(ECF No. 1-1, at 21.) The Court fails to discern any deficiency of counsel or resulting prejudice from its review of the record.

In analyzing the same claim through the lens of ineffective assistance of appellate counsel, the Supreme Court of Virginia found as follows:

> The record, including the trial transcript and appellate filings, demonstrates that in response to petitioner's alibi evidence the Commonwealth presented rebuttal testimony from Delbridge, and inmate incarcerated with petitioner prior to trial. In part, Delbridge testified that petitioner said he was "going to get one of his baby mommas to lie for him" to say petitioner was with her on the day of the crimes.

Delbridge also testified petitioner talked to him about "another baby momma" who could put him at the scene of the crime. Petitioner told [Delbridge] he was going to ensure this woman did not come to court and that his family and friends were "keeping tabs" on her. At trial, petitioner acknowledged that Melvina Banks was the mother of his daughter and that he had talked to Banks while incarcerated.

Following Delbridge's testimony, the prosecutor requested permission from the court to play a jail telephone call between Banks and petitioner. The prosecutor represented that most of the talking on the recording was done by Banks and quoted a statement made by Banks to petitioner during the call: "They're calling me and texting me again this morning, but we're not going to talk about that."

The prosecutor indicated this statement made in reference to a call Detective Branch made to Banks approximately two hours before her call with petitioner was recorded. The prosecutor contended Banks' statements were not hearsay because nothing she said on the tape would be offered for the truth of the matter. The prosecutor also explained the purpose of the recording was to corroborate Delbridge's testimony. The prosecutor represented that the Commonwealth attempted to subpoena Banks for trial, but she had avoided personal service of the subpoena and, after the Commonwealth resorted to posting the subpoena, Banks had not appeared. In response, counsel objected to the admission of the recording, unless it contained inculpatory statements from petitioner. Counsel also argued the recording constituted "hearsay on top of hearsay" and violated petitioner's confrontation clause rights. The trial court ruled the recording was admissible. The Commonwealth recalled Detective Branch, who testified as to his attempts to contact Banks, and played the recording during his testimony. Detective Branch identified the voices on the recording as Banks and petitioner and testified he called Banks two hours before the recorded telephone call. The court reporter did not transcribe the recording as it was played for the jury. No party requested the tape containing the recording be made part of the record nor did counsel separately obtain and file a transcript of the recording. . . .

A copy of the recording played at trial is not in the record. Further, petitioner fails to proffer the content of the recording nor does he describe any inadmissible hearsay contained in the recording or explain what, if any, effect it had on the verdict. Thus, petitioner has failed to demonstrate there is a reasonably probability that, but for counsel's alleged error, the result of the proceeding would have been different.

(SCVA Record 933–34.)

Here, counsel clearly objected to the admission of the recording during trial on more than one ground including that it was inadmissible hearsay and that playing the recording would violate the confrontation clause. (Mar. 29, 2016 Tr. 229, 231–33.) However, it was evident that Melvina Banks had been avoiding service and was unavailable as a witness. (Mar. 29, 2016 Tr. 230–31.) It was equally evident that Banks' unavailability as a witness at trial had been secured, in part, by

Lane, with the intent to prevent her from testifying. The Circuit Court overruled the objections and admitted the recording because it was "not going to let anybody try and secrete themselves from the court system and play games." (Mar. 29, 2016 Tr. 233–34.) Although Lane believes that counsel should have "moved to suppress this tape" (ECF No. 1-1, at 21), he fails identify on what grounds or what further argument counsel could have advanced. At most, Lane repeatedly states that the recording was "inadmissible" throughout his § 2254 Petition and argues that the admission of the recording "caused the Petitioner fundamental unfairness at his trial." (*Id.*) Simply put, Lane fails to offer any other argument that counsel could have made that would have had a reasonable probability of convincing the Circuit Court to refuse to admit the recording. Thus, he fails to demonstrate any deficiency of counsel or resulting prejudice through these vague allegations. Accordingly, Claim Two (d) lack merit and will be DISMISSED.

## VI.   CONCLUSION

For the foregoing reasons, Respondent's Motion to Dismiss (ECF No. 10) will be GRANTED. Lane's claims will be DISMISSED, and his § 2254 Petition (ECF No. 1) will be DENIED. The action will be DISMISSED. A certificate of appealability will be DENIED.[11]

An appropriate Final Order shall issue.

Date: 22 February 2021
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge

---

[11] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Lane fails to meet this standard.